**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| STEVE JOHNSON and LISA MARIE JOHNSON, d/b/a STEVE JOHNSON FARM; on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>THE MOSAIC COMPANY; NUTRIEN LTD.; NUTRIEN AG SOLUTIONS, INC.; CF INDUSTRIES HOLDING, INC.; CF INDUSTRIES, INC.; CF INDUSTRIES NITROGEN, LLC; KOCH AGRONOMIC SERVICES, LLC; KOCH FERTILIZER, LLC; YARA INTERNATIONAL ASA; YARA NORTH AMERICA, INC.; and CANPOTEX LTD.,<br><br>Defendants. | Case No. ____________________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. This action arises from Defendants' conspiracy to fix, raise, maintain, and/or stabilize prices for nitrogen, phosphate, and potassium (potash) fertilizers ("NPK Fertilizers") from at least as early as January 1, 2021, until Defendants' unlawful conduct and its anticompetitive effects cease (the "Class Period").[1] Defendants' coordinated scheme has caused American farmers, agricultural cooperatives, and other purchasers throughout the fertilizer supply chain to pay artificially inflated prices for the essential crop nutrients upon which modern agriculture depends.

---

[1] "Defendants" is defined as The Mosaic Co., Nutrien Ltd., Nutrien Ag Solutions, Inc., CF Industries Holding, Inc., CF Industries, Inc., CF Industries Nitrogen, LLC, Koch Agronomic Services, LLC, Koch Fertilizer, LLC, Yara International ASA, Yara North America, Inc., and Canpotex Ltd.

2. Defendants are direct competitors and are the largest producers and sellers of NPK Fertilizers in the United States. Together, they control over 80% of the North American nitrogen fertilizer market, over 90% of the North American phosphate fertilizer market, and approximately 90% of the North American potash market. This extraordinary concentration of market power enabled Defendants to coordinate on price to the detriment of purchasers at every level of the supply chain.

3. Plaintiffs bring this case on behalf of all individuals and entities in the United States who purchased NPK Fertilizers directly from one or more Defendants. All putative class members were injured by Defendants' conspiracy, which artificially inflated NPK Fertilizer prices at every level of distribution throughout the United States.

4. Defendants' conspiracy was facilitated and concealed by the highly concentrated structure of the NPK Fertilizer market. The commodity nature of NPK Fertilizers, high barriers to entry, highly inelastic demand, and Defendants' extensive overlapping memberships on the boards and committees of shared industry trade associations created conditions uniquely susceptible to coordinated anticompetitive conduct. Defendants also shared competitively sensitive pricing, production, and sales information through joint ventures and export marketing arrangements that would otherwise remain confidential.

5. NPK Fertilizer prices remained persistently elevated well above pre-conspiracy levels even as the input costs and global supply disruptions Defendants cited to justify their price increases receded. Prices remained high even as commodity markets broadly softened—behavior fundamentally inconsistent with competition and consistent with coordinated restraint of supply and price.

6. On March 4, 2026, Bloomberg reported that the U.S. Department of Justice Antitrust Division had opened a formal investigation into the pricing practices of major fertilizer producers to determine whether they colluded or coordinated to raise NPK Fertilizer prices charged to U.S. farmers. This investigation, together with Congressional testimony, executive branch action, and correspondence from leading farm organizations seeking antitrust enforcement, confirms the urgency of these claims.

7. Plaintiffs and the proposed Class seek damages, injunctive relief, and disgorgement of ill-gotten profits for injuries sustained as a result of Defendants' violations of Section 1 of the Sherman Act and the common law of unjust enrichment.

## JURISDICTION AND VENUE

8. Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 for injunctive relief, including reasonable attorneys' fees and costs of this litigation, for Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and under the common law of unjust enrichment.

9. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

10. The Court also has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because: (a) there are more than 100 members of the Class; (b) citizenship of at least one proposed Class member is different from that of any Defendant; and (c) the matter in controversy, after aggregating the claims of the proposed Class members, exceeds $5,000,000, exclusive of interest and costs.

11. Venue is proper in this judicial district under 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b) and (c) because, during the Class Period, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

12. This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of NPK Fertilizers throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Further jurisdictional contacts are alleged below.

## THE PARTIES

### PLAINTIFFS

13. Plaintiffs Steve Johnson and Lisa Marie Johnson are citizens and residents of Missouri, doing business as Steve Johnson Farm and operating in the state of Missouri. During the Class Period, Plaintiffs purchased NPK Fertilizers directly from Defendant Nutrien Ag Solutions, Inc. for end use and suffered antitrust injuries as a result of the violations alleged in this Complaint.

### DEFENDANTS

#### i. Mosaic

14. The Mosaic Company is a publicly traded company incorporated in Delaware with its principal place of business in Tampa, Florida. The Mosaic Company was formed in October 2004 by a merger between IMC Global and Cargill's crop nutrition division, immediately creating one of the world's largest producers of fertilizers. In 2016, Mosaic acquired Vale S.A.'s Vale Fertilizantes business, giving it access to two additional Potash plants in Brazil and Saskatchewan. Mosaic is currently one of the largest North American producers of Potash and Phosphorus Fertilizers. During the Class Period, Mosaic sold Phosphate Fertilizers and Potash to purchasers in the United States, including members of the Class.

**ii. Nutrien**

15. Nutrien Ltd. is a publicly traded Canadian company with its principal place of business in Saskatoon, Saskatchewan. Nutrien arose out of PotashCorp, which was first established as a public corporation by the government of Saskatchewan in 1975. Following its 1990 privatization, the company pursued an aggressive expansion strategy, acquiring major U.S. producers of fertilizers such as Potash Company of America, TexasGulf, and White Springs Agricultural Chemicals. In 2016, PotashCorp proposed a merger with Agrium, a supplier of agricultural products and a major producer of Potash. In 2018, the FTC approved the merger contingent on the divestiture of two Agrium facilities, neither of which produced Potash. The combined company became the world's largest Potash producer, operating six of Saskatchewan's ten Potash mines, and the second largest fertilizer company worldwide. As of the date of consolidation, the merged firm held approximately 60% of Potash capacity in North America.

16. Nutrien Ag Solutions, Inc. is a wholly-owned subsidiary of Nutrien Ltd. that is incorporated in Delaware with its principal place of business in Loveland, Colorado. During the Class Period, Nutrien sold Nitrogen Fertilizers, Phosphorus Fertilizers, and Potash to purchasers in the United States, including members of the Class.

**iii. CF Industries**

17. CF Industries Holdings, Inc. is a publicly traded company incorporated in Delaware with its principal place of business in Northbrook, Illinois. CF Industries is the world's largest producer of ammonia, a key input in Nitrogen Fertilizers. CF Industries Inc. is a wholly-owned subsidiary of CF Industries Holdings, Inc. that is incorporated in Delaware with its principal place of business in Northbrook, Illinois, and serves as the primary operating subsidiary of CF Industries Holdings. CF Industries owns approximately 89% of CF Industries Nitrogen, LLC; agricultural

cooperative CHS Inc. owns the remainder. CF Industries Nitrogen, LLC is incorporated in Delaware with its principal place of business in Northbrook, Illinois. During the Class Period, CF Industries sold Nitrogen Fertilizers to purchasers in the United States, including members of the Class.

**iv. Koch**

18. Koch Agronomic Services, LLC is a Delaware limited liability company whose members are citizens of Kansas. Koch Fertilizer, LLC is a Kansas limited liability company whose members are citizens of Kansas. Koch is one of the world's largest producers of Nitrogen Fertilizers. During the Class Period, Koch sold Nitrogen Fertilizers to purchasers in the United States, including members of the Class.

**v. Yara**

19. Yara International ASA is a publicly traded Norwegian company with its principal place of business in Oslo, Norway. Yara is one of the world's largest producers of Nitrogen Fertilizers. Yara North America, Inc. is a wholly-owned subsidiary of Yara International ASA that is incorporated in Delaware with its principal place of business in Tampa, Florida. During the Class Period, Yara sold Nitrogen Fertilizers to purchasers in the United States, including members of the Class.

**vi. Canpotex**

20. Canpotex Limited is a Canadian joint venture that is wholly owned by Mosaic and Nutrien. Canpotex is headquartered in Saskatoon, Canada. Canpotex manages and operates a fleet of customized railcars, port terminal facilities, ocean vessels, and more, serving Mosaic and Nutrien in transporting Potash. Canpotex was formed in 1972 as a joint export association for Canadian Potash producers. Through Canpotex, its owners collectively market and distribute

Potash produced from their Canadian mines to customers outside of North America. Canpotex's five largest markets—Brazil, China, India, Indonesia, and Malaysia—account for approximately 75% of Canpotex's annual Potash exports.

21. Canpotex operates an integrated export system. By selling Potash through a single export marketing organization, Canpotex provides its owners, Defendants Nutrien and Mosaic, with a mechanism for coordinating key aspects of Potash sales, including export volumes and shipment schedules. Canpotex collects and manages competitively sensitive information concerning Potash production, inventories, customer demand, pricing conditions, and shipment logistics. While Canpotex is not used to export Potash into the United States, its use as a joint exporting and marketing organization creates opportunities for would-be competitors Nutrien and Mosaic to exchange competitively sensitive information and align their pricing and supply strategies in the United States.

**vii. Unnamed Co-Conspirators and Other Non-Parties**

22. Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described herein. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs. Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## FACTUAL ALLEGATIONS

### A. The NPK Fertilizer Market and Its Susceptibility to Collusion

23. The United States NPK fertilizer market—comprised of nitrogen, phosphate, and potash (potassium) fertilizers—is indispensable to American agriculture. American farms cultivate over 220 million acres of cropland, generating unrelenting annual demand for NPK fertilizers. In 2024, the U.S. NPK fertilizer market was valued at approximately $30 billion.

24. Fertilizer demand in the United States is driven primarily by the intensive cultivation of row crops—particularly corn—which account for the majority of planted acreage and fertilizer consumption. Corn production alone consumes approximately 45% of all nitrogen fertilizer applied domestically.[2] In 2023, U.S. farmers planted approximately 89.9 million acres of corn.[3] Demand for corn-based ethanol under the Renewable Fuel Standard further intensifies nitrogen fertilizer demand by mandating the conversion of over five billion bushels of corn annually into fuel. Every American farmer who grows corn, as well as certain other crops, must purchase NPK fertilizers each planting season, making these products a non-discretionary input cost that cannot be avoided. As Defendant Yara puts it, "Plant nutrients are building blocks of crop material. Without nutrients, the crops can not grow. … Three main nutrients: Nitrogen, Phosphorus, and Potassium are the primary nutrients. … They cannot replace each other, and lack of any one nutrient limits crop growth."[4]

---

[2] Market Data Forecast, *U.S. Fertilizers Market Size* (Oct. 2025).
[3] USDA, National Agricultural Statistics Service, *Acreage Report* (June 2023).
[4] Yara, Fertilizer Industry Handbook 2025, (April 2025) https://www.yara.com/siteassets/investors/057-reports-and-presentations/other/2025/yara-fertilizer-industry-handbook-2025-with-notes.pdf

25. “Nitrogen is the most important primary nutrient.”[5] Nitrogen fertilizers, the most widely used class, are derived from the Haber-Bosch synthesis of ammonia, which combines atmospheric nitrogen with hydrogen derived from natural gas. Finished nitrogen fertilizer products are sold as standardized granules or prills interchangeable regardless of producer. Defendants CF Industries, Koch Agronomic Services, Yara International ASA, and Nutrien collectively control approximately 82% of North American nitrogen fertilizer production capacity.

26. Phosphate fertilizers supply phosphorus by processing mined phosphate rock through acid treatment to yield concentrated diammonium phosphate (DAP), monoammonium phosphate (MAP), and triple superphosphate (TSP). These products are commodity-grade granules traded on standardized specifications. Defendants Nutrien and The Mosaic Company together account for over 90% of North American phosphate fertilizer production capacity.

27. Potash fertilizers supply potassium from mined potash ores. Potassium chloride (muriate of potash) is the predominant product and is sold as a crystalline solid interchangeable across producers. Defendants Nutrien and Mosaic—acting in part through their jointly owned export vehicle, Canpotex Limited—account for approximately 90% of North American potash production capacity. Canpotex alone controls over 90% of the North American potash export market.

28. NPK fertilizers are not freely substitutable with other inputs. Because they supply the three primary macronutrients in precise, concentrated, rapid-release form adaptable to virtually all major crops and soil types, they are the essential input for high-yield commercial agriculture. Farmers cannot readily substitute organic alternatives or secondary nutrients for NPK fertilizers

---

[5] Yara, Fertilizer Industry Handbook 2025, (April 2025) https://www.yara.com/siteassets/investors/057-reports-and-presentations/other/2025/yara-fertilizer-industry-handbook-2025-with-notes.pdf

without sacrificing yield reliability and operational efficiency. Demand is therefore highly inelastic: farmers must purchase NPK fertilizers regardless of price fluctuations during the growing season.

29. The NPK fertilizer industry has undergone dramatic consolidation since the 1980s, when approximately 46 firms competed in the market. Today, fewer than 13 firms remain, and the Defendants named herein dominate each major nutrient segment. Fewer sellers mean lower coordination costs, reduced incentives to cheat on collusive price levels, and a diminished risk that secret price-cutting will go undetected.

30. The extraordinary degree of market concentration in the NPK fertilizer industry is confirmed by independent economic analysis. Economists from Texas A&M University's Agricultural and Food Policy Center recently examined fertilizer market conditions using the Herfindahl–Hirschman Index ("HHI"), the standard measure of market concentration used by the Department of Justice and FTC in horizontal merger analyses.[6] The study found HHI scores for the U.S. fertilizer market of 3,455 for potash, 2,382 for nitrogen, and 4,553 for phosphate—levels that far exceed the 1,800-point threshold above which the DOJ/FTC Merger Guidelines designate a market as "highly concentrated" and presumptively susceptible to coordinated anticompetitive conduct.[7] The same study found that the top four firms control 100% of U.S. potash and phosphate production, and 77% of U.S. nitrogen production. The Texas A&M economists also concluded that increases in natural gas costs "explained less than 20% of the increase in fertilizer prices paid

---

[6] Bart L. Fischer et al., *Concentration and Competition in the U.S. Fertilizer Industry*, Agricultural and Food Policy Center, Texas A&M University (Mar. 2024), available at https://afpc.tamu.edu/research/publications/725/BP-24-1_AFPC-Fertilizer-Markets-May2024.pdf.

[7] U.S. Department of Justice & FTC, *Merger Guidelines* § 2.1 n.14 (2023) (designating markets with HHI above 1,800 as "highly concentrated").

by producers in 2022"—directly refuting Defendants' attribution of elevated prices to input cost inflation.[8]

31. The study presented its HHI findings in tabular form, reproduced below, demonstrating that U.S. fertilizer market concentration for all three NPK nutrient categories far exceeds the 1,800-point threshold for "highly concentrated" markets under the DOJ/FTC Merger Guidelines:

**Table 2. Herfindahl-Hirschman Index (HHI) measure for Fertilizers by Geographic Scope**

| Geographic Scope | United States | North America | World |
|---|---|---|---|
| Potash | 3,455 | 4,255 | 1,011 |
| Nitrogen | 2,382 | 2,242 | 368 |
| Phosphate | 4,553 | 4,533 | 152 |

32. The same study also calculated four-firm concentration ratios (CR4) showing that the top four firms control 100% of U.S. potash and phosphate production and 77% of U.S. nitrogen production:

**Table 3. Four-firm concentration (CR4) measure for Fertilizers by Geographic Scope**

| Geographic Scope | United States | North America | World |
|---|---|---|---|
| Potash | 100% | 99% | 84% |
| Nitrogen | 77% | 77% | 13% |
| Phosphate | 100% | 100% | 25% |

33. Because NPK fertilizers are standardized commodities, transactions are easily compared across sellers, and deviations from a collusive price are immediately visible to co-conspirators.

34. High barriers to entry further shelter the conspiracy. Constructing a competitive nitrogen synthesis plant or phosphate beneficiation complex requires billions of dollars of capital

[8] Fischer et al., *Concentration and Competition in the U.S. Fertilizer Industry*, at 16.

outlays, years of permitting and construction, access to feedstocks or ore reserves, and specialized technical expertise. These barriers allow Defendants to maintain supracompetitive prices without fear that new competitors will erode margins before the conspirators can recover the gains of coordination.

35. Additionally, the demand side of the NPK fertilizer market is highly dispersed. Purchasers include hundreds of thousands of individual farmers, agricultural retailers, fertilizer blenders, and farm cooperatives, none of whom individually accounts for a significant share of any Defendant's revenues. This asymmetry eliminates countervailing buyer power that might otherwise discipline Defendants' pricing: no single purchaser can credibly threaten to shift sufficient volume to induce a Defendant to defect from the collusive price.

**B. Market Concentration for NPK Fertilizers**

36. American farms cultivate over 220 million acres of cropland, driving unrelenting demand for NPK fertilizers. The U.S. NPK fertilizer market was valued at approximately $30 billion in 2024. NPK fertilizers are favored over other inputs because they supply the three macronutrients crops require in the largest amounts—in highly concentrated, predictable, and fast-acting form—providing precise nutrient content, easy storage and transport, rapid nutrient release, and adaptability to most major crops and soil types.

37. The fertilizer industry in the United States has long been characterized by significant consolidation. The number of firms in the NPK fertilizer industry has reduced from 46 to 13 since the 1980s, with Defendants now controlling a substantial portion of the market, as illustrated by the chart below.[9]

[9] Farm Action, *Fact Sheet: The Fertilizer Sector* (2024), available at https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf.

**Figure 2. Number of NPK Fertilizer Companies in North America (1990/2024)[2]**




38. As a result of this consolidation, each of the major nutrient industries is today dominated by a single corporation: Mosaic dominates the American phosphate market, CF Industries commands the nitrogen sector, and Nutrien has taken charge of the North American potash market as the leading member alongside Mosaic. Given these extraordinary market shares, farmers and agricultural retailers purchase substantial quantities of NPK fertilizers from one or more of these Defendants.[10]

**C. Defendants Control the Nitrogen Market in the United States**

39. Combined, Koch, CF Industries, Nutrien, and Yara control 82% of the North American nitrogen fertilizer market, as depicted in the chart below.[11]

---

[10] Nathan Beacom, *Record Prices Give Rise to Consolidation Concerns in the Fertilizer Industry*, Offrange (Sept. 23, 2022), available at https://ambrook.com/offrange/supply-chain/record-prices-consolidation-concerns-fertilizer-industry-ukraine-nitrogen.
[11] Farm Action, *Fact Sheet: The Fertilizer Sector*, *supra* n.6.




40. CF Industries is the largest producer of ammonia in the world.[12] CF then sells ammonia as-is or upgrades it to other nitrogen fertilizer products such as urea, urea ammonium nitrate, and ammonium nitrate.

41. Nutrien publicly states that it is the third-largest nitrogen producer in the world and the #2 North American nitrogen producer, with more than 7 million tonnes of annual gross ammonia nameplate capacity.[13]

42. Koch Fertilizer has substantial nitrogen production facilities in the United States.

43. Koch Agronomic Services (KAS) is also directly involved in the commercialization of nitrogen fertilizer products. KAS publicly markets ANVOL™, CENTURO™, and SUPERU™ as nitrogen-focused inputs intended for use with core nitrogen fertilizers, placing KAS squarely

---

[12] CF Industries, *Products*, available at https://www.cfindustries.com/products.

[13] Nutrien, *Our Business: Nitrogen*, available at https://www.nutrien.com/about/our-business/nitrogen.

within the commercial nitrogen fertilizer ecosystem as an entity actively marketing differentiated nitrogen products and technologies to growers and retailers.[14]

44. Yara is the world's largest producer of nitrogen fertilizers and NPK fertilizers.[15] Yara North America's role in the conspiracy is amplified by Yara International's status as the world's largest global producer of nitrogen fertilizers.

**D. Defendants Control the Phosphate Market in the United States**

45. With Mosaic controlling a commanding 67% and Nutrien at 24%, two Defendants together hold 91% of the North American phosphate fertilizer market, as depicted in the chart below.[16]




[14] Koch Fertilizer, *Quality Products. Proven Results.*, available at https://kochfertilizer.com/products.

[15] International Finance Corporation, *IFC Project Information and Data Portal: Yara Corporate*, available at https://disclosures.ifc.org/project-detail/ESRS/38320/yara-corporate.

[16] Farm Action, *Fact Sheet: The Fertilizer Sector*, *supra* n.6.

46. Mosaic is the world's largest producer of finished phosphate products, with an annual operational capacity of approximately 16.8 million tonnes of concentrated phosphates—a capacity greater than the next two largest global phosphate producers combined.[17]

47. Mosaic's dominance in the United States is even more extreme. Mosaic produces over 64% of phosphate rock mined in the United States and manufactures 80% of phosphate fertilizers produced in North America. Mosaic has been estimated to control over 90% of phosphate-fertilizer sales to U.S. farmers.[18] Together, Mosaic and co-defendant Nutrien represent over 90% of North American phosphate production capacity.

48. Nutrien states that it is the second-largest phosphate producer in North America.[19]

**E. Defendants Control the Potash Market in the United States**

49. With Nutrien holding 55% of the market and Mosaic at 35%, Defendants together control at least 90% of the North American potash market, as depicted in the chart below.[20]




[17] The Mosaic Company, *About: Who We Are*, available at https://mosaicco.com/About.
[18] Farm Action, *Agricultural System Concentration Data*, at 3 (Aug. 2024), available at https://farmaction.us/concentrationdata/.
[19] Nutrien, *Our Business: Phosphate*, available at https://www.nutrien.com/about/our-business/phosphate.
[20] Farm Action, *Fact Sheet: The Fertilizer Sector*, *supra* n.6.

50. Nutrien publicly states that it is "the world's largest soft rock miner and potash producer" and the "#1 global potash producer."[21]

51. Mosaic has approximately 10.4 million tonnes of operational potash capacity, making it a major global potash producer and the second-largest potash producer in North America behind co-defendant Nutrien. In North America, Mosaic accounts for approximately 35% of estimated annual potash production.[22]

52. Canpotex—using mines owned by Nutrien and Mosaic—produces approximately 13 million tonnes of potash annually.[23] The United States is heavily dependent on imported potash. The U.S. Geological Survey reported that U.S. net import reliance for potash was 93 percent of apparent consumption in 2024, and that Canada accounted for 79 percent of U.S. potash imports during 2020–2023.[24]

53. Given that degree of U.S. dependence on Canadian potash, major decisions concerning the routing, timing, and allocation of Saskatchewan potash exports are capable of affecting the overall supply of potash available to North American markets, including the United States. Decisions by Canpotex to direct potash tonnage into offshore channels, delay shipments, maintain port inventories, or commit forward volumes abroad would predictably influence the amount of comparable potash available for sale into the United States.

---

[21] Nutrien, *Our Business: Potash*, available at https://www.nutrien.com/about/our-business/potash.
[22] Fitch Ratings, *Fitch Rates The Mosaic Company's Proposed Senior Unsecured Notes 'BBB'* (Nov. 10, 2025), available at https://www.fitchratings.com/research/corporate-finance/fitch-rates-the-mosaic-company-proposed-senior-unsecured-notes-bbb-10-11-2025.
[23] Canpotex, *Our Markets*, available at https://www.canpotex.com/what-we-do/our-markets/.
[24] USGS, *Mineral Commodity Summaries: Potash* (2025), available at https://pubs.usgs.gov/periodicals/mcs2025/mcs2025-potash.pdf.

### F. The Canpotex Joint Venture as a Mechanism for Coordination

54. Defendant Canpotex Limited is a private, jointly owned export company equally owned by Nutrien, Ltd. (of which Nutrien Ag Solutions is the retail subsidiary) and Mosaic Canada Corp Nutrition, LP (a wholly owned subsidiary of Mosaic). Canpotex is headquartered in Saskatoon, Saskatchewan, Canada.

55. Canpotex functions as a potash cartel management entity for the North American market's two dominant producers. Through Canpotex, Nutrien and Mosaic jointly determine export volumes, coordinate on potash pricing to international purchasers, and allocate sales territories. These coordination mechanisms (even if nominally directed at export markets) necessarily inform the pricing strategies, output decisions, and competitive posture that Nutrien and Mosaic bring to their U.S. domestic sales.

56. On January 21, 2026, United States Department of Agriculture Deputy Secretary Stephen Vaden publicly stated, during a recorded webinar hosted by the National Agricultural Law Center, that Nutrien and Mosaic "have a joint venture in Canada where they openly—their word—work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States." Vaden further stated that although Canpotex does not formally operate within the United States, Nutrien and Mosaic "through other means" have achieved the same result: "constraining supply and driving up the price that farmers pay."[25]

57. Vaden went on to say that "[t]he duopoly that is Mosaic and Nutrien and their successful efforts over the past several years to constrain fertilizer supply in this country and drive up the costs that farmers are paying." He also promised that "[w]e're not going to allow these two companies to do anything to undermine this or any other new market participant that wants to

[25] Remarks of USDA Deputy Secretary Stephen Vaden, National Agricultural Law Center Webinar (Jan. 21, 2026), available at https://nationalaglawcenter.org/webinars/vaden.

come in, provide new fertilizer supply and break up the cute little game that Mosaic and Nutrien have been playing for the last several years."[26]

58. Canpotex thus provides the two dominant potash and phosphate producers with an institutionalized forum for coordinating competitive strategy, an established information-sharing infrastructure, and a template for joint output and pricing decisions. These are conditions antitrust economists recognize as substantially increasing the probability of successful cartelization extending to domestic sales.

### G. Defendants' Extensive Overlapping Participation in Trade Associations Provided Repeated Opportunities and Forums for Price Coordination

59. In addition to the Canpotex joint venture, Defendants participated in a web of overlapping trade associations whose governance structures, in-person meetings, and members-only information-sharing resources provided repeated private forums for senior executives to meet, exchange competitively sensitive pricing and supply information, and reach or reinforce agreements on NPK fertilizer prices.

60. ***International Fertilizer Association (IFA):*** All six Defendants are active members of the IFA, a Paris-headquartered global fertilizer association. Senior executives of CF Industries (Bruce Bohn), The Mosaic Company (Bruce Bodine), Nutrien (Kenneth Seitz), and Yara International ASA (Svein Tore Holsether) serve as members of the IFA's Board of Directors.[27] The IFA sponsors recurring in-person events—including its Annual Conference and its Cultivating Tomorrow Conference—at which these executives and their counterparts from Koch and Canpotex

[26] *Id.*
[27] International Fertilizer Association (IFA), *Board of Directors*, available at https://www.fertilizer.org/about-ifa/structure-governance/our-board/.

convene.[28] These events provide structured and informal occasions for Defendants' senior leadership to meet outside of normal commercial channels.

61. ***The Fertilizer Institute (TFI):*** CF Industries, Koch Fertilizer LLC, Mosaic, Nutrien, and Yara North America are members and Board members of TFI, a national fertilizer industry organization headquartered in Arlington, Virginia.[29] TFI offers its members exclusive "market volatility information and resources"—a category of members-only market intelligence that may function as a mechanism for exchanging the forward-looking supply and pricing data that facilitates price coordination.[30] TFI also sponsors an Annual Business Conference, an Agronomy Conference and Expo, a World Fertilizer Conference, and a Market & Logistics Conference, each of which brings Defendants' executives into direct contact.[31]

62. ***Fertilizer Canada (FC):*** All six Defendants are members of Fertilizer Canada, a Canadian fertilizer industry organization based in Ottawa.[32] CF Industries, Koch Fertilizer Canada, Mosaic, Nutrien, and Yara North America hold Board seats.[33] FC represents producers, manufacturers, and wholesale and retail distributors of nitrogen, phosphate, potash, and sulfur fertilizers, providing a combined governance forum that places all major North American NPK producers around the same table.

63. ***The Sulfur Institute (TSI):*** Nutrien, Mosaic, and Koch Sulfur Products Company LLC are members and Board members of TSI, a Washington, D.C.-based association for sulfur

---

[28] International Fertilizer Association (IFA), *Events*, available at https://www.fertilizer.org/news-events/events/

[29] The Fertilizer Institute (TFI), *Leadership*, available at https://www.tfi.org/about-us/leadership/.

[30] The Fertilizer Institute (TFI), *Market Intelligence Insights*, available at https://www.tfi.org/market-intel/.

[31] The Fertilizer Institute (TFI), *Event Calendar*, available at https://www.tfi.org/events/event-calendar/.

[32] Fertilizer Canada, *About*, available at https://fertilizercanada.ca/about/.

[33] *Id.*

and sulfuric acid professionals.[34] Sulfuric acid is a key feedstock in phosphate fertilizer manufacturing, making TSI a natural forum for coordination among the dominant phosphate producers.

64. ***Fertilizer Industry Round Table (FIRT):*** David Bilby of CF Industries and Shawn McGreevy of Koch Fertilizer LLC serve as current FIRT Board members;[35] Gary Vogen of Yara North America has previously served.[36] FIRT hosts an annual meeting in partnership with TFI, creating yet another structured opportunity for Defendants' executives to convene.[37]

65. ***Agricultural Retailers Association (ARA):*** Koch Agronomic Services and Mosaic are ARA members;[38] Nathan Packer of Nutrien Ag Solutions and Bob Ness of Mosaic serve on the ARA Board.[39] ARA holds an Annual Conference and Expo[40] and semi-annual in-person committee meetings,[41] extending Defendants' joint access to forums spanning the retail distribution channel.

66. The density of Defendants' joint participation in these overlapping organizations granted them ample opportunity to collude. Antitrust economists recognize that trade associations providing members-only information exchange and regular direct access among competitors are

---

[34] The Sulphur Institute (TSI), *About TSI: Member Companies*, available at https://www.sulphurinstitute.org/about-tsi/member-companies/.

[35] Fertilizer Industry Round Table (FIRT), *Current Board*, available at http://www.firt.org/about/current-board.

[36] Fertilizer Industry Round Table (FIRT), *Past Members*, available at http://www.firt.org/about/past-member.

[37] Fertilizer Industry Round Table (FIRT), *About FIRT*, available at http://www.firt.org/about.

[38] Agricultural Retailers Association (ARA), *Members*, available at https://www.aradc.org/members.

[39] Agricultural Retailers Association (ARA), *Board of Directors*, available at https://www.aradc.org/board.

[40] Agricultural Retailers Association (ARA), *2026 Annual Conference and Expo*, available at https://www.aradc.org/2026-conference-expo.

[41] Agricultural Retailers Association (ARA), *Get Involved*, available at https://www.aradc.org/get-involved.

structural facilitators of price-fixing conspiracies, particularly in concentrated commodity markets where participants can readily verify compliance with agreed price levels.

### H. Government Investigations Corroborate the Existence of the Conspiracy

67. The alleged price-fixing conspiracy has attracted intensive scrutiny from multiple branches of the federal government, providing significant corroborating support for Plaintiffs' allegations.

68. On December 6, 2025, President Donald J. Trump issued an Executive Order directing the United States Attorney General and the Chairman of the Federal Trade Commission each to establish a Food Supply Chain Security Task Force within their respective agencies, with a mandate to aggressively investigate price-fixing and anti-competitive practices across the food sector, including the fertilizer industry.[42] The Executive Order reflects a presidential determination that anticompetitive pricing in food and agricultural inputs, including fertilizer, poses a threat to national food supply security.

69. On January 21, 2026, as detailed above, United States Department of Agriculture Deputy Secretary Stephen Vaden publicly accused Nutrien and Mosaic of coordinating to constrain fertilizer supply and raise prices paid by American farmers, characterizing their joint conduct as collusion and describing the administration's intent to take action to restore competition. During a visit to the USDA headquarters by Michigan Farm Bureau members, Deputy Secretary Vaden again denounced the anticompetitive conduct in the NPK fertilizer market, saying: "I think we have a problem. There are two companies in this country that control some 90% of your key inputs. That's not what I would call a health operating market with lots of

---

[42] The White House, *Fact Sheet: President Donald J. Trump Addresses Security Risks from Price Fixing and Anti-Competitive Behavior in the Food Supply Chain* (Dec. 6, 2025), available at https://www.whitehouse.gov/fact-sheets/2025/12/fact-sheet-president-donald-j-trump-addresses-security-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain/.

competition so that you can be assured the prices that you pay reflect actual market values." During that visit, Secretary Vaden also called attention to the fact that the timing of price hikes, and reports of supposed supply issues from fertilizer manufacturers to producers, often coincides with the release of the USDA's Farmer Bridge Assistance payments.[43]

70. Deputy Vaden has been an outspoken critic of the fertilizer industry. In a recent March 6, 2023 Youtube interview, Deputy Vaden was asked about price transparency in the fertilizer industry. Deputy Vaden replied that the best price transparency comes from a truly competitive market and "[we] don't currently have that from my point of view, there are not enough competitors in the fertilizer market space."[44] Deputy Vaden also raised issues with the lack of increase supply from current market participants despite the economics strongly demanding more supply. According to Deputy Vaden, the demand for new participants is so high that a completely new entrant to the fertilizer market is currently investing $13 billion to benefit from the strong economics of the fertilizer market.

71. Vaden's statements represent an express, on-record accusation of anticompetitive coordination by a senior agency official in the Trump administration, made in a recorded public forum.

72. On March 4, 2026, Bloomberg reported that the Department of Justice Antitrust Division had opened a formal antitrust investigation into the pricing practices of major fertilizer producers to determine whether they colluded or coordinated to raise nitrogen, phosphate, and potash fertilizer prices for American farmers. Bloomberg reported that the investigation is

---

[43] Dennis Rudat, *Deputy Ag Secretary Vaden: Fertilizer Monopoly 'Stridently Trying to Sell a Fantasy Story*, Farm News Media (March 20, 2026) available at https://www.michiganfarmnews.com/deputy-ag-secretary-vaden-fertilizer-monopoly-stridently-trying-to-sell-a-fantasy-story-.

[44] https://www.youtube.com/watch?v=AmxTtqAQ0aY

specifically focused on Defendants CF Industries, Koch Inc., Mosaic, Nutrien, and Yara International.[45]

73. Sources familiar with the Department of Justice investigation told reporters that the government inquiry is examining whether coordinated pricing or supply decisions by these companies crossed the line into civil or criminal antitrust violations.[46]

74. On March 12, 2026, United States Senator Josh Hawley, Chairman of the Senate Subcommittee on Crime and Counterterrorism, sent a letter directly to Christopher Bohn, President and Chief Executive Officer of Defendant CF Industries Holdings Inc., regarding what he described as a sudden and striking increase in fertilizer prices over the prior two weeks.[47] Senator Hawley warned that current record retail nitrogen pricing could cripple American corn production and that "American farmers should not be forced to bankroll opportunistic pricing under cover of an overseas crisis." [48]

75. Senator Hawley's letter demanded that CF Industries respond by March 27, 2026 to ten specific questions that go to the heart of the conduct alleged in this Complaint. These questions demanded that CF Industries identify every price change since February 28, 2026 by date, product, geography, and percentage increase; identify with specificity the cost increases that

---

[45] Josh Sisco, *DOJ Probes US Fertilizer Market for Possible Price Fixing*, Bloomberg Law (Mar. 4, 2026), available at https://www.bloomberglaw.com/bloomberglawnews/antitrust/BNA%200000019cba7ed36fa5bcbefe83ad0000.

[46] *Id.*

[47] Letter from Senator Josh Hawley to Christopher Bohn, President and CEO, CF Industries Holdings Inc. (Mar. 12, 2026); *see also* Naveen Thukral & Ed White, *Farmers See Fertilizer Price Surge as Iran War Blocks Exports, Threatening Losses*, Reuters (Mar. 5, 2026), available at https://www.reuters.com/business/energy/iran-war-threatens-asia-fertiliser-supplies-ahead-planting-season-2026-03-05/.

[48] Letter from Senator Josh Hawley to Christopher Bohn, President and CEO, CF Industries Holdings Inc. (Mar. 12, 2026).

allegedly justified each price change; disclose whether the company had reduced output, delayed shipments, limited allocations, withdrawn quotes, or otherwise restricted supply since February 28, 2022; and disclose current inventory levels by product and location. Critically, the letter also demanded that CF Industries disclose whether, since February 28, 2026, it had "communicated with any competitor regarding prices, production, inventory, allocations, capacity, market conditions, customer terms, or timing of announcements," and whether, since January 1, 2025, it had used "any pricing formula, pricing committee, internal strategy document, or market-monitoring process that references competitor pricing, 'price leadership,' parallel pricing, supply discipline, or similar concepts."[49] The letter also demanded that CF Industries disclose whether it had issued any litigation hold or document-preservation notice relating to fertilizer pricing, output, allocations, antitrust, or communications with competitors, and demanded that CF Industries preserve all documents and communications concerning fertilizer pricing, production, inventory, capacity, allocations, freight, and competitor communications from January 1, 2025 to present.

76. On the same date, Senator Hawley wrote separately to Attorney General Pamela Bondi urging the Department of Justice to formally investigate potential anticompetitive conduct and price gouging in the U.S. fertilizer market.[50] Senator Hawley observed that the fertilizer market is already highly concentrated, that the DOJ was already examining whether major fertilizer producers colluded to raise prices, and that the Iran crisis price spikes were occurring against this backdrop of a market dominated by a small number of firms. He urged the Department to open or expand a formal investigation into pricing, output, allocation, and communications practices among fertilizer producers; to determine whether any producer had used the Iran crisis as a pretext

[49] Letter from Senator Josh Hawley to Christopher Bohn, President and CEO, CF Industries Holdings Inc. (Mar. 12, 2026).

[50] Letter from Senator Josh Hawley to Attorney General Pamela Bondi (Mar. 12, 2026).

for unjustified price increases or supply constraints; and to review whether any coordinated conduct, information sharing, production discipline, or parallel pricing may violate antitrust laws. Senator Hawley's letter to the Attorney General, contemporaneous with his letter to CF Industries' CEO, reflects congressional recognition that the sudden price increases following the Iran conflict were inconsistent with competitive market behavior in an already highly concentrated industry subject to a live DOJ investigation.

77. In February 2026, both the Iowa Corn Growers Association and the Texas Corn Producers Association sent separate letters to United States Attorney General Pam Bondi seeking information about the Department of Justice's pursuit of antitrust action against the fertilizer industry.[51] These letters reflect the depth and breadth of concern among farmer organizations across major agricultural states about the pricing conduct at issue in this lawsuit.

78. On October 28, 2025, Mark Mueller, President of the Iowa Corn Growers Association, testified before the U.S. Senate Committee on the Judiciary at its Hearing on Competition Issues in the Seed & Fertilizer Industries. Mueller testified that the "massive increase in the cost of fertilizer is crushing corn growers in Iowa, and they aren't alone." He attributed elevated fertilizer prices to decades of unchecked consolidation, which left only a few major companies controlling each market segment. Mueller testified that the amount of corn sales required to purchase a single unit of monoammonium phosphate (MAP) had risen from a five-year

[51] Michelle Rook, *DOJ Begins Probe of Fertilizer Producers for Collusion: Is it Warranted?*, Progressive Farmer (Mar. 9, 2026), available at https://www.dtnpf.com/agriculture/web/ag/crops/article/2026/03/05/iowa-corn-growers-urge-doj-press.

average of 136 bushels to 230 bushels—an increase of nearly 70%—as fertilizer prices escalated while crop revenues remained comparatively stagnant.[52]

79. On September 26, 2025, the Department of Justice's Antitrust Division and the USDA signed a Memorandum of Understanding formalizing a partnership between the agencies to protect competition in key agricultural markets, including fertilizer. The MOU emphasized the agencies' commitment to "protecting American farmers from the burdens imposed by high and volatile input costs," including fertilizer.[53]

80. Concerns about anticompetitive pricing in the fertilizer industry were raised as early as December 8, 2021, when the Family Farm Action Alliance sent a letter to the United States Department of Justice calling for an investigation into the highly consolidated fertilizer sector on suspicion of anti-competitive practices. The letter noted that Defendants' own documents refuted their supply shortage claims, observing that Nutrien's annual report disclosed it had "curtailed production . . . while maintaining flexibility to respond to improvements in the market condition," and that Nutrien's potash capacity exceeded current production levels at a cash cost to produce potash of $59 per tonne in 2020—"the lowest level on record for Nutrien."[54]

---

[52] Testimony of Mark Mueller, President of the Iowa Corn Growers Association, U.S. Senate Committee on the Judiciary, Hearing on Competition Issues in the Seed & Fertilizer Industries (Oct. 28, 2025), available at https://www.grassley.senate.gov/imo/media/doc/mark_mueller_testimony_senate_judiciary_committee_submitted_version.pdf.

[53] Dep't of Justice, Office of Public Affairs, *Justice Department and USDA Coordinate to Protect Competition in Agricultural Inputs* (Sept. 29, 2025), available at https://www.justice.gov/opa/pr/justice-department-and-usda-coordinate-protect-competition-agricultural-inputs; Memorandum of Understanding Between the Antitrust Division, Department of Justice and the Department of Agriculture Relative to Cooperation with Respect to Strengthening Competition for Agricultural Inputs (Sept. 26, 2025), available at https://www.justice.gov/atr/media/1415501/dl?inline.

[54] Letter from Joe Maxwell, President of Family Farm Action Alliance, to the U.S. Department of Justice (Dec. 8, 2021), available at https://farmaction.us/wp-content/uploads/2021/12/FFAA_DOJ_Fertilizer_Investigation_Final.pdf.

### I. NPK Fertilizer Prices Rose Sharply During the Class Period and Remained Elevated Despite Lower Input Costs and Declining Demand

81. Prior to January 1, 2021, NPK fertilizer price movements were broadly consistent with competitive market dynamics: prices fluctuated with input costs—primarily natural gas for nitrogen, phosphate rock and sulfuric acid for phosphate, and mining costs for potash—and adjusted relatively promptly when input cost pressures abated.

82. Beginning in January 2021, NPK fertilizer prices increased dramatically and sustained elevated levels well beyond what changes in input costs, demand fundamentals, or legitimate supply disruptions could explain. Fertilizer prices increased approximately 60% in 2021[55] and an additional 132% in 2022. These price dynamics departed materially from the pre-conspiracy pattern of transitory, input-cost-driven price movements followed by competitive correction.




83. Defendants' own public earnings disclosures confirm the parallel and synchronized nature of these price increases. For nitrogen fertilizers, Nutrien reported that its average year-over-

[55] *Access to Fertilizer: Competition and Supply Chain Concerns*, 87 Fed. Reg. 15,142 (Mar. 17, 2022), available at https://www.federalregister.gov/documents/2022/03/17/2022-05670/access-to-fertilizer-competition-and-supply-chain-concerns.

year prices increased across all forms from 2021 to 2022: ammonia rose from approximately $477 per metric ton to approximately $973 per metric ton (a 104% increase); urea rose from approximately $478 to $696 per metric ton (a 46% increase); and nitrates rose from approximately $238 to $402 per metric ton (a 69% increase).[56] Only days later, CF Industries reported similar year-over-year increases: ammonia rose from approximately $452 to $849 per metric ton (an 88% increase); urea from $397 to $574 per metric ton (a 45% increase); UAN solution from $247 to $477 per metric ton (a 93% increase); and ammonium nitrate from $269 to $480 per metric ton (a 78% increase).[57]

84. For phosphate fertilizers, Nutrien reported that its average price in North America increased from approximately $602 per metric ton in 2021 to approximately $806 per metric ton in 2022, a 34% increase.[58] Mosaic reported a similar increase, from approximately $564 per metric ton in 2021 to approximately $804 per metric ton in 2022, a 43% increase.[59] Although phosphate prices declined in 2023, the price decreases did not last. In 2025, Nutrien reported that its North American phosphate price rose from approximately $615 per metric ton in Q4 2024 to

---

[56] Nutrien Ltd., Press Release, *Nutrien Reports Fourth Quarter and Full-Year 2022 Results* (Feb. 15, 2023), available at https://cdn.sanity.io/files/ixv7nalm/production/674db9d566c2e8807825272bd0d1d6fe2f382a84.pdf.

[57] CF Industries Holdings, Inc., Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2022 (Feb. 15, 2023), available at https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001324404&type=10-K.

[58] Nutrien Ltd., Press Release, *Nutrien Reports Fourth Quarter and Full-Year 2022 Results* (Feb. 15, 2023).

[59] The Mosaic Company, Press Release, *Mosaic Reports Fourth Quarter and Full Year 2022 Results*, Exhibit 99.1 to Form 8-K (Feb. 22, 2023), available at https://investors.mosaicco.com/press-releases.

approximately $677 per metric ton in Q4 2025 (a 10% increase), and Mosaic reported an increase from approximately $593 to $686 per metric ton (a 16% increase).[60]

85. For potash, Nutrien reported that its average North American price rose from approximately $317 per metric ton in 2021 to approximately $667 per metric ton in 2022, a 110% increase.[61] Mosaic reported an increase from approximately $285 per metric ton in 2021 to approximately $632 per metric ton in 2022, a 122% increase.[62] Potash prices similarly recovered after a 2023 decline: Nutrien reported that its North American potash price rose from approximately $270 per metric ton in Q4 2024 to approximately $305 per metric ton in Q4 2025 (a 13% increase), and Mosaic reported an increase from approximately $199 to $264 per metric ton (a 33% increase).[63]

86. Publicly available Producer Price Index data from the U.S. Bureau of Labor Statistics confirm a strong parallel pattern across all three NPK nutrient categories: a sharp increase beginning in 2021, peak prices in 2022, a partial retreat in 2023, and a renewed upward trend beginning in 2024 and continuing through the present. The nitrogen, phosphate, and potash PPI charts below—covering the period 2016 through 2026—illustrate this synchronized movement across three chemically distinct markets with different cost structures and different producers:[64]

---

[60] Nutrien Ltd., Press Release, *Nutrien Reports Fourth Quarter and Full-Year 2025 Results* (Feb. 18, 2026); The Mosaic Company, Press Release, *Mosaic Reports Fourth Quarter and Full Year 2025 Results* (Feb. 24, 2026).

[61] Nutrien Ltd., Press Release, *Nutrien Reports Fourth Quarter and Full-Year 2022 Results* (Feb. 15, 2023).

[62] The Mosaic Company, Press Release, *Mosaic Reports Fourth Quarter and Full Year 2022 Results*, Exhibit 99.1 to Form 8-K (Feb. 22, 2023).

[63] Nutrien Ltd., Press Release, *Nutrien Reports Fourth Quarter and Full-Year 2025 Results* (Feb. 18, 2026); The Mosaic Company, Press Release, *Mosaic Reports Fourth Quarter and Full Year 2025 Results* (Feb. 24, 2026).

[64] U.S. Bureau of Labor Statistics, Producer Price Index by Industry: Nitrogenous Fertilizer Manufacturing: Primary Products; Phosphatic Fertilizer Manufacturing; Potash, Soda, and Borate




**Nitrogen Fertilizer Producer Price Index for 2016-2026**




**Phosphate Fertilizer Producer Price Index for 2016-2026**




---

Mineral Mining: Primary Products, via FRED, Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org.

**Potash Fertilizer Producer Price Index for 2016-2022**[65]




87. The nitrogen price spike was especially severe at the outset of the Class Period. By December 2021, the USDA estimated year-over-year price increases of 235% for anhydrous ammonia, 149% for urea, and 192% for liquid nitrogen (32% UAN), as illustrated in the chart below:[66]

[65] Data discontinued after 2022.
[66] Angelica Williams & Amy Boline, *Fertilizer Prices Spike in Leading U.S. Market in Late 2021, Just Ahead of 2022 Planting Season*, USDA Economic Research Service (Feb. 9, 2022), available at https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=103194.




88. The price increases during the Class Period cannot be explained by input costs alone, and Defendants' own published financial results prove it. Based on Defendants' publicly reported financial data:

(a) In fiscal year 2021, CF Industries reported gross margin of $2.39 billion, a 199% increase from $801 million in 2020. By contrast, net sales increased only 38% over the same period.[67]

(b) In fiscal year 2022, Nutrien's cost of goods sold increased 18% compared to 2021, from $14.8 billion to $17.5 billion. Over the same period, Nutrien's

[67] CF Industries Holdings, Inc., Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2021, filed with the U.S. Securities and Exchange Commission (Feb. 24, 2022), available at https://www.sec.gov/Archives/edgar/data/0001324404/000132440422000008/cf-20211231.htm.

net earnings increased 592% — from $459 million to $3.18 billion — while gross margin increased 80%, from $5.2 billion to $9.4 billion.[68]

(d) In fiscal year 2022, CF Industries reported net earnings of $3.35 billion — an increase of approximately 892% from $317 million in 2020, while cost of sales over the same period increased approximately 80%. CF Industries' own 10-K attributed the surge primarily to a 73% increase in average selling prices, which increased gross margin by $4.80 billion, while higher natural gas costs reduced gross margin by only $1.05 billion.[69]

(e) In 2022, Mosaic's profits increased by 120%, while cost of sales increased by only 46%.

(f) In 2021, Nutrien's gross manufacturing profit margin increased 669% from 2020, even though its costs of goods sold increased only 58% over the same period. This dramatic expansion of profits continued into 2022, with Mosaic improving on its 2021 profits by 120%, Nutrien by 142%, and CF Industries by 212%.[70]

89. The dramatic, simultaneous profit expansion across all major Defendant companies during the Class Period is illustrated in the chart below, which shows profits for Nutrien, Mosaic, CF Industries, and Yara from 2001 through 2023. The synchronous spike in 2022 is anomalous relative to any prior period and is more consistent with coordinated pricing conduct than with independent competitive responses to cost changes:

[68] Nutrien Ltd., Annual Report on Form 40-F for the Fiscal Year Ended December 31, 2022, Exhibit 99.3 (Consolidated Financial Statements), filed with the U.S. Securities and Exchange Commission (Feb. 22, 2023).

[69] CF Industries Holdings, Inc., Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2022, filed with the SEC (Feb. 15, 2023), EDGAR accession no. 0001324404-23-000006, available at https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001324404&type=10-K&dateb=&owner=include&count=10.

[70] Farm Action, *Fact Sheet: The Fertilizer Sector*, *supra* n.6.




90. In a competitive market, input cost increases compress margins; they do not produce the sort of margin expansion documented above. These ratios are inconsistent with competitive pricing and consistent with producers exercising coordinated market power to extract rents from inelastic demand during a period of global supply disruption that they used as cover to maintain supracompetitive price levels.

91. Defendants have repeatedly attributed NPK fertilizer price increases during the Class Period to general inflation, logistics disruptions, and global supply events, including the war in Ukraine and resulting sanctions on exports from Russia and Belarus. But international supply disruptions do not fully explain the persistently elevated prices. For phosphate fertilizers, for instance, only 2% of U.S. fertilizer needs were met through imports in 2022, meaning that import-related disruptions had minimal direct effect on domestic supply.[71]

---

[71] Farm Action, *Fact Sheet: The Fertilizer Sector*, *supra* n.6.

92. Regarding potash, following the 2022 invasion of Ukraine, producers outside sanctioned countries would have been incentivized to increase supply levels to take share from their competitors. Without any other restriction on supply, a continued expansion should have resulted in prices falling back to pre-2022 levels. Yet prices remained at supracompetitive levels well above 2021 levels throughout this period. Potash producers' collective refusal to cut prices constitutes action that would, absent a conspiracy to increase or stabilize prices, be against their individual economic self-interest.

93. Moreover, in December 2025, the United States agreed to remove sanctions on Belarusian potash, a major source of global supply, in exchange for the release of political prisoners. The reopening of this significant supply source should have caused potash prices to fall. Instead, the reaction in potash prices was "muted," with the newly available supply failing to bring down prices.[72] The failure of a major new supply source to discipline prices is anomalous in a competitive market and is consistent with coordinated supply restriction by Defendants.

94. Nor do input price increases explain the persistently elevated price of nitrogen fertilizer. Natural gas is the primary feedstock for nitrogen fertilizer production, yet nitrogen fertilizer prices remained elevated throughout the Class Period even when natural gas prices were relatively cheap. As one industry publication observed, prices across all three fertilizer categories "remain[ed] stubbornly high" throughout the Class Period, "even as commodity markets soften[ed]."[73]

---

[72] RealAgriculture Market Team, *Sticky Input Prices and Short Supplies: What's Keeping Fertilizer Costs High?*, RealAgriculture (Aug. 28, 2025), available at https://www.realagriculture.com/2025/08/sticky-input-prices-and-short-supplies-whats-keeping-fertilizer-costs-high/.

[73] *Id.*

95. Beginning in mid-2024, fertilizer prices across all three nutrient categories resumed their upward trend, as demonstrated by the American Farm Bureau Federation production input cost data below. The chart shows that fertilizer expenditures by U.S. farmers—both in absolute dollar terms and as a share of total production expenses—remained elevated well above pre-Class Period levels through 2025, despite the temporary 2023 retreat:[74]




96. Yara's own public disclosures provide further corroboration. In its Integrated Report 2021, published March 24, 2022, Yara disclosed as a business risk that "increased price transparency can challenge fertilizer premiums," thereby acknowledging that it was sustaining premiums above commodity-competitive levels and that greater market transparency posed a threat to its ability to maintain them.[75] Separately, in its Fourth Quarter and Full Year 2021 Report, released February 10, 2022, Yara attributed an approximately 71% year-over-year increase in its Americas segment EBITDA to "higher production margins in North America and slightly higher

---

[74] Faith Parum, *Fertilizer Outlook: Global Risks, Higher Costs, Tighter Margins*, American Farm Bureau Federation — Market Intel (Sept. 11, 2025), available at https://www.fb.org/market-intel/fertilizer-outlook-global-risks-higher-costs-tighter-margins.

[75] Yara International ASA, *Integrated Report 2021: Growing a Nature-Positive Food Future* (Mar. 24, 2022), available at https://www.yara.com/siteassets/investors/057-reports-and-presentations/annual-reports/2021/yara-integrated-report-2021.pdf.

deliveries."[76] Yara's own characterization confirms that the financial gains reflected margin expansion driven by pricing power during the class period.

97. In its Q1 2022 earnings materials released May 2–3, 2022, Mosaic stated that second quarter phosphate price increases "are expected to significantly outpace the impact of higher raw material prices on our cost structure."[77] This public statement—made on a call monitored by investors, analysts, and competitors across the industry—announced Mosaic's intention to expand its margins above and beyond any cost-justified amount. In a competitive market, a dominant firm would not publicly telegraph an intention to raise prices beyond cost recovery; doing so serves as a signal to competing producers that Mosaic would not undercut prevailing price levels, thereby reinforcing the collusive equilibrium. This statement is therefore consistent with the coordinated pricing conduct alleged herein.

98. CF Industries, in quarterly earnings releases and calls throughout 2021 and 2022, publicly projected that strong demand and constrained global supply would sustain elevated pricing favorable to nitrogen producers.[78] As recently as its Q4 and Full Year 2025 earnings call on February 19, 2026, CF Industries management continued to describe the global nitrogen market in terms consistent with the conduct alleged herein. Bert Frost, CF's Executive Vice President and

---

[76] Yara International ASA, *Fourth Quarter and Full Year Report 2021*, at 3 (Feb. 7, 2022), available at https://ml-eu.globenewswire.com/Resource/Download/9d271a64-fb0a-46c1-8729-7ec5f3bc88f0.

[77] The Mosaic Company, Press Release, *The Mosaic Company Reports First Quarter 2022 Results*, Exhibit 99.1 to Form 8-K (May 2, 2022), available at https://www.sec.gov/Archives/edgar/data/1285785/000124378622000081/pressreleaseq12022-ex991.htm; The Mosaic Company, Q1 2022 Earnings Conference Call Transcript (May 3, 2022), available at https://www.fool.com/earnings/call-transcripts/2022/05/03/mosaic-mos-q1-2022-earnings-call-transcript/.

[78] CF Industries Holdings, Inc., Press Releases (Exhibit 99.1 to Form 8-K): Q2 2021 (Aug. 9, 2021); Q4/Full Year 2021 (Feb. 15, 2022); Q1 2022 (May 4, 2022); Q2 2022 (Aug. 1, 2022), all available at SEC EDGAR, https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001324404&type=8-K.

Chief Commercial Officer, stated that the global nitrogen market "remains tighter than expected," that "global nitrogen channel inventories are lower than historical averages," and that supply "is constrained" by production disruptions across multiple regions. The company's simultaneously filed press release identified "resilient global nitrogen demand" and "continued global supply constraints" as the basis for management's expectation that conditions would remain "constructive."[79] These projections—made publicly, consistently, and in coordination with similar messaging from Nutrien, Mosaic, and Yara—functioned as forward guidance to the market confirming that none of the dominant nitrogen producers intended to compete aggressively on price, removing the competitive uncertainty that would otherwise discipline pricing in a non-collusive market.

**J. Coordinated Production Curtailments Further Evidence the Conspiracy**

99. In addition to pricing conduct, Defendants engaged in a pattern of coordinated production curtailments that reduced the supply of NPK fertilizers available to U.S. farmers, supporting elevated price levels at times when competitive market logic dictated production expansion or maintenance.

100. Mosaic's repeated curtailments at its Colonsay, Saskatchewan potash mine are the most extensively documented example. In December 2022, Mosaic publicly announced it was temporarily curtailing production at Colonsay, which had been operating at an annual run rate of 1.3 million metric tons with plans to expand to 1.8 to 2.0 million metric tons annually.[80] The

---

[79] CF Industries Holdings, Inc., Press Release, *CF Industries Holdings, Inc. Reports Full Year 2025 Net Earnings of $1.46 Billion*, Exhibit 99.1 to Form 8-K (Feb. 18, 2026); CF Industries Holdings, Inc., Q4/FY2025 Earnings Call Transcript (Feb. 19, 2026) (Bert Frost, prepared remarks).

[80] The Mosaic Company, Press Release, *Mosaic Announces Temporary Curtailment at Its Colonsay Potash Mine* (Dec. 6, 2022), available at https://investors.mosaicco.com/press-releases/news-details/2022/Mosaic-Announces-Temporary-Curtailment-at-Its-Colonsay-Potash-Mine/default.aspx.

announced curtailment reduced that available capacity just before it stated in its Q4 2022 earnings call that it "believe[d] . . . demand is going to recover for potash" and that "the price[s] will stay at a healthy level."[81] The near-simultaneous prediction of demand recovery and decision to curtail supply is inconsistent with competitive profit maximization—a rational competitive producer facing recovering demand would increase, not decrease, production to capture share.

101. Industry analysts immediately recognized the market signaling function of the Colonsay curtailment. BMO Capital Markets analyst Joel Jackson observed at the time: "Historically, Nutrien or Mosaic announcing curtailments was typically a positive development for price." The same analyst described the curtailment as "messaging that prices may not fall much more and that Mosaic will not produce potash just for the sake of production."[82] This language describes precisely the kind of output signaling that economists recognize as a mechanism for coordinating supracompetitive prices among oligopolists.

102. Mosaic repeated this conduct in its Q4 2023 earnings call, in which CEO Bruce Bodine announced another curtailment at Colonsay, stating: "For potash, supply is adequate to meet demand in the near term and economics have not yet improved, which is why we intend to curtail production at Colonsay. We will continue to monitor market developments and customer demand." Bodine further described the curtailments as demonstrating Mosaic's "commitment to flexibly managing our network" to ensure its "low-cost sites at Belle Plaine and Esterhazy, operate at capacity while Colonsay is only used when market conditions dictate." This confirms a

---

[81] The Mosaic Company, Q4 2022 Earnings Call Transcript (Feb. 23, 2023), available at https://www.fool.com/earnings/call-transcripts/2023/02/23/mosaic-mos-q4-2022-earnings-call-transcript/.

[82] Cecilia Jamasmie, *Mosaic Cuts Back Production at Colonsay Potash Mine*, Mining.com (Dec. 7, 2022), available at https://www.mining.com/mosaic-cuts-back-production-at-colonsay-potash-mine/.

deliberate, ongoing strategy of withholding available production capacity from the market to support price levels rather than competing on production volume.[83]

103. Mosaic curtailed Colonsay again in March 2024, announcing that the mine "will remain idle until market conditions improve."[84] This third curtailment occurred while Mosaic was simultaneously expanding its Esterhazy mine. The pattern of expanding low-cost capacity while repeatedly idling a separate mine specifically in response to price conditions demonstrates a deliberate strategy of supply management designed to maintain price levels above competitive equilibrium, not operational necessity.

104. These curtailments are economically significant. One Bloomberg Intelligence analysis estimated that cutting production at Colonsay could reduce Mosaic's first quarter 2023 potash sales by 325,000 metric tons and cost the company $140 million in revenue.[85] The willingness to forego $140 million in revenue to avoid depressing prices is conduct against individual economic self-interest that is explicable only as part of a coordinated agreement. A firm acting unilaterally in a competitive market would not sacrifice $140 million in near-term revenue when it expected demand to recover; it would maximize production to capture that demand. Mosaic's choice to curtail instead is consistent with a coordinated agreement to restrict supply and support elevated prices.

---

[83] The Mosaic Company, Q4 2023 Earnings Call Transcript (Feb. 22, 2024), available at https://www.fool.com/earnings/call-transcripts/2024/02/22/mosaic-mos-q4-2023-earnings-call-transcript/.

[84] The Mosaic Company, Press Release, *The Mosaic Company Reports First Quarter 2024 Results*, Exhibit 99.1 to Form 8-K (May 1, 2024), available at https://www.sec.gov/Archives/edgar/data/1285785/000200403224000008/pressreleaseq12024-ex991.htm.

[85] *Mosaic Curtails Potash Output at Canada Mine on Demand Slump*, Bloomberg (Dec. 7, 2022), available via Yahoo Finance at https://ca.finance.yahoo.com/news/mosaic-curtails-potash-output-canada-220639361.html.

105. Nutrien similarly managed its production to support pricing objectives during the Class Period. After ramping up potash production in the immediate aftermath of the Russia-Ukraine conflict, Nutrien abruptly shifted to an "indefinite pause of our potash ramp up,"[86] signaling to competitors that it would not compete on volume to drive prices lower.

106. Earlier in the Class Period, prior to the Russia-Ukraine conflict, Mosaic and Nutrien had jointly idled and closed domestic phosphate production facilities. Farm groups documented that "Mosaic and Nutrien announcing separately they would idle and close plants, tak[ing] roughly 2.1 million short tons of North American production offline."[87] These coordinated capacity reductions, which farm groups and industry observers attributed to a strategy of supply management rather than operational necessity, are part of the same pattern of coordinated supply restriction that continued throughout the Class Period.

### K. Defendants Coordinated Use of Trade Remedy Petitions to Eliminate Foreign Competition

107. Defendants' anticompetitive conduct extended beyond production curtailments and pricing coordination to encompass the coordinated use of the federal trade remedy process to eliminate foreign competition that might otherwise have disciplined their pricing power.

108. In 2020, Mosaic filed petitions with the U.S. Department of Commerce seeking countervailing duty (CVD) investigations of phosphate fertilizer imports from Morocco and Russia. In March 2021, the U.S. International Trade Commission voted to impose countervailing

---

[86] Nutrien Ltd., Press Release, *Nutrien Reports Second Quarter 2023 Results*, Exhibit 99.1 to Form 6-K (Aug. 2, 2023), available at https://www.sec.gov/Archives/edgar/data/0001725964/000119312523201867/d505673dex991.htm.

[87] Chris Clayton, *Farm Groups Raise Concerns Over Phosphate Fertilizer Tariffs Creating 'Near-Monopoly'*, DTN Progressive Farmer (Nov. 1, 2021), available at https://www.dtnpf.com/agriculture/web/ag/crops/article/2021/11/01/farm-groups-raise-concerns-phosphate.

duties on phosphate fertilizers from both countries. The duties on Moroccan imports exceeded 19%; the duties on Russian imports were set as high as 47.05% for certain producers.

109. Agricultural groups opposed these petitions and challenged the resulting duties, documenting significant anticompetitive effects. In filings submitted to the ITC, national farm organizations documented that Mosaic's control of the domestic phosphate market had grown from approximately 74% to more than 80% following imposition of the duties, "gaining a near-monopoly over the phosphate fertilizer supply in the U.S." as one organization characterized it.[88] Farm groups further documented that as a result of the duties combined with existing 25% Section 301 tariffs on Chinese phosphate imports, "less than 15% of exports in the world would be available to U.S. farmers without tariffs"[89]—effectively insulating Mosaic and Nutrien from virtually all foreign price competition in the domestic phosphate market.

110. The economic impact on American farmers was severe and directly traceable to these petitions. An analysis by Texas A&M University economists estimated that the countervailing duties cost U.S. farmers approximately $6.9 billion through the 2021 to 2025 planting seasons alone.[90]

111. Separately, in late 2021 CF Industries filed a petition seeking countervailing and antidumping duties on urea ammonium nitrate (UAN) solution imports from Russia and Trinidad and Tobago. UAN is a nitrogen fertilizer product in which CF Industries holds a dominant market

[88] Chris Clayton, *Farm Groups Raise Concerns Over Phosphate Fertilizer Tariffs Creating 'Near-Monopoly'*, DTN Progressive Farmer (Nov. 1, 2021), available at https://www.dtnpf.com/agriculture/web/ag/crops/article/2021/11/01/farm-groups-raise-concerns-phosphate.
[89] Farm Progress, *Ag Groups Urge Against Phosphate Countervailing Duties*, available at https://farmprogress.com/regulatory/ag-groups-urge-against-phosphate-countervailing-duties.
[90] Agricultural and Food Policy Center (AFPC), Texas A&M University, *Increased Costs of Phosphate Fertilizers in the U.S. Due to Countervailing Duties*, Research Report No. RR-26-01 (2026), available at https://afpc.tamu.edu/research/publications/files/732/RR-26-01.pdf.

position. As with Mosaic's phosphate petitions, CF Industries' petition, if successful, would eliminate the primary foreign competitive constraint on CF Industries' domestic UAN pricing. The filing of this petition at a time when UAN prices were already elevated, and when CF Industries was reporting record margins on nitrogen products, is consistent with a strategy of reinforcing and extending domestic pricing power rather than responding to genuine unfair trade injury.

112. The pattern of these petitions supports the inference that the trade remedy process was used as a coordinated tool to entrench domestic pricing power rather than as an independent response to unfair foreign competition. In December 2021, the National Corn Growers Association and its state affiliates sent an open letter to Mosaic demanding that it voluntarily withdraw its countervailing duty petitions, accusing the company of "irresponsible corporate behavior" and stating that "using Commerce and ITC to manipulate the supply curve does indeed dictate price to farmers."[91] This reflects the contemporaneous understanding of market participants about the anticompetitive purpose and effect of these petitions.

### L. The Fertilizer Industry's History of Antitrust Violations

113. The NPK fertilizer industry has a demonstrated prior history of antitrust violations that is directly relevant to evaluating the plausibility of the current conspiracy. In the early 1990s, several potash producers were the subject of a price-fixing investigation by the Antitrust Division of the United States Department of Justice.[92] That prior investigation targeted the same market segment—potash—and the same type of conduct—coordinated pricing and supply management—

---

[91] *Corn Growers to Mosaic: Stop Engaging in Irresponsible Corporate Behavior and End Fertilizer Tariffs*, NCGA.com (Dec. 17, 2021), available at https://ncga.com/stay-informed/media/in-the-news/article/2021/12/corn-growers-to-mosaic-stop-engaging-in-irresponsible-corporate-behavior-and-end-fertilizer-tariffs.

[92] *See* Courthouse News Service, *Potash Price-Fixing Conspiracy Alleged* (Sept. 12, 2008), available at https://www.courthousenews.com/potash-price-fixing-conspiracy-alleged/ (discussing DOJ Antitrust Division investigation of potash producers in the early 1990s).

that is alleged herein. The Defendants and their predecessors thus have institutional knowledge of, and prior government scrutiny for, the precise anticompetitive conduct alleged in this Complaint.

114. In 2008, purchasers of potash fertilizers filed antitrust class action lawsuits in the United States alleging that major producers—including Mosaic, PotashCorp (now Nutrien's predecessor), and Agrium (now merged into Nutrien)—had coordinated their production and sales to keep potash prices artificially elevated. The purchasers alleged that producers shared market information, allocated sales volumes, and restricted output as part of a coordinated global scheme.

115. Several Defendant predecessors and affiliates later settled those private antitrust claims for a total of nearly $100 million. Mosaic and PotashCorp each paid approximately $43.75 million to settle the claims against them.

116. The industry's prior antitrust exposure also demonstrates that Defendants possess institutional knowledge of how potash and phosphate price coordination can be structured, implemented, and maintained. A conspiracy organized by firms with prior experience in, or institutional memory of, cartel conduct is more readily plausible and more easily initiated than one conceived from scratch.

**M. Specific Acts in Furtherance of the Conspiracy**

117. In furtherance of the unlawful agreement to fix, raise, stabilize, and maintain prices for NPK fertilizers, Defendants engaged in, among others, the following specific acts:

(a) Exchanging competitively sensitive pricing, output, and supply information among themselves and through trade association vehicles, including but not limited to the IFA, TFI, Fertilizer Canada, and FIRT, in amounts, on schedules, and with specificity that exceeds what legitimate trade association activity requires and that would tend to facilitate price coordination;

(b) Participating in in-person meetings and conversations—including at the recurring trade events sponsored by the IFA, TFI, Fertilizer Canada, the Sulfur Institute, FIRT, and ARA identified above—during which they agreed upon price levels, discussed output and supply restraint strategies,

and otherwise fixed, raised, stabilized, or maintained prices for NPK fertilizers in the United States;

(c) Using the Canpotex export joint venture as a mechanism for coordinating the supply, pricing, and volume strategies of the two dominant North American potash and phosphate producers in ways that directly informed and reinforced domestic U.S. pricing decisions for NPK fertilizers;

(d) Coordinating production and output levels—including through the repeated Colonsay curtailments described herein, through coordinated facility idlings and closures prior to and during the Class Period, and through the management of production ramp-ups and reductions in lockstep with announced pricing guidance—to constrain the supply of NPK fertilizers available in the U.S. market in a manner that supported and maintained supracompetitive price levels;

(e) Using public earnings calls, investor communications, and trade publication statements to signal pricing intentions to competitor producers—including Mosaic's May 2022 announcement that price increases would "significantly outpace" raw material costs, and CF Industries' consistent forward guidance on "tight supply" and "favorable pricing conditions," in a manner that removed the competitive uncertainty that would otherwise discipline pricing in a non-collusive market; and

(f) Filing coordinated countervailing duty and antidumping petitions through the federal trade remedy process to eliminate foreign competitive constraints on domestic phosphate and nitrogen fertilizer pricing, thereby entrenching each dominant Defendant's pricing power in its respective market segment.

## N. Additional Economic Plus Factors Supporting the Existence of a Conspiracy

118. The following economic "plus factors", which provide corroborating circumstantial evidence of a price-fixing conspiracy under Section 1 of the Sherman Act, are present here:

119. ***Parallel Pricing Inconsistent with Competition***. During the Class Period, Defendants announced and implemented price increases for NPK fertilizers in a pattern characterized by near-simultaneous announcements, parallel magnitude, and parallel timing that is inconsistent with independent competitive pricing in a market of this size and complexity. In a competitive market, each seller facing declining input costs and stable-to-flat demand would have competitive incentives to undercut rivals' prices to gain market share. The sustained absence of

such price competition during the Class Period, despite the documented input cost declines that should have produced competitive price reductions, is indicative of unlawful coordination.

120. ***Margin Expansion Disproportionate to Cost Increases***. As alleged herein, each Defendant's financial results during the Class Period demonstrate margin expansion of six to eleven times the rate of input cost increases. This pattern was uniform across all major Defendants, sustained across multiple years, and occurring during the same Class Period. It is inconsistent with independent competitive behavior and is consistent with coordinated exploitation of market power. The uniformity of this pattern across competitors who face different cost structures, different geographic footprints, and different product mixes is a significant plus factor supporting the inference of coordination.

121. ***Conduct Against Individual Self-Interest Absent Agreement***. In a competitive market, a rational producer facing lower input costs and recovering demand would maximize production to capture share at the expense of higher-cost rivals. Mosaic's repeated decision to curtail Colonsay, thereby sacrificing an estimated $140 million in near-term revenue in a single quarter, constitutes conduct against individual economic self-interest that is inexplicable absent a coordinated agreement under which each Defendant has agreed to forego the short-term gains of price competition in exchange for collectively maintained supracompetitive price levels.

122. ***Signaling Through Public Statements***. During the Class Period, Defendants' executives made public statements that functioned as market-wide pricing signals communicating their intent to maintain elevated price levels and not to compete on volume. Mosaic's public announcement that price increases would "significantly outpace" cost increases, Nutrien's "indefinite pause" of its "potash ramp up," and CF Industries' consistent forward guidance on supply tightness collectively removed the competitive uncertainty that would in a non-collusive

market create pressure for price reductions. The convergent, forward-looking, and non-cost-based nature of these statements distinguishes them from ordinary investor disclosures and supports the inference that they served a coordinating function.

123. ***Absence of Legitimate Explanation***. The pricing patterns observed during the Class Period lack a plausible non-collusive explanation. While the Russia-Ukraine conflict created genuine temporary supply disruptions in global potash and nitrogen markets, Defendants' financial results demonstrate that their margin expansion vastly exceeded any amount attributable to cost-justified price increases during the conflict period, and that elevated margins persisted long after global supply conditions normalized. The Defendants' collective market power, the barriers to new entry, the inelasticity of demand, and the structural conditions described herein would not independently produce sustained supracompetitive pricing of this magnitude and duration absent agreement.

**O. Antitrust Injury to Plaintiffs and the Class**

124. As a direct and proximate result of Defendants' unlawful agreement to fix, raise, stabilize, and maintain prices for NPK fertilizers, Plaintiffs and members of the Class paid supracompetitive prices for NPK fertilizers purchased directly from Defendants during the Class Period. The difference between the actual price paid and the price that would have prevailed in a competitive market absent Defendants' conspiracy constitutes antitrust injury to Plaintiffs and the Class within the meaning of Section 4 of the Clayton Act.

125. The amount of overcharge paid by Plaintiffs and Class members can be estimated using well-accepted econometric methods, including benchmark analysis comparing actual prices during the Class Period to competitive benchmark prices derived from pre-conspiracy price data, input cost indices, and comparable markets unaffected by the conspiracy. The precise amount of damages is subject to proof at trial.

126. Defendants' unlawful conduct injured competition in the NPK fertilizer market by eliminating price competition among the dominant producers, depriving Plaintiffs and the Class of the benefit of competitive pricing, and artificially constraining the supply of fertilizers available to American farmers—causing farmers to pay more for essential agricultural inputs, reduce planted acreage, or forego productive farming operations they could have profitably undertaken at competitive fertilizer prices.

**P. Anticompetitive Effects and Relevant Antitrust Markets**

127. Defendants' anticompetitive conduct had the following effects, among others:

a. Competition among the Defendants has been restrained or eliminated with respect to NPK Fertilizer prices;

b. The price of NPK Fertilizers has been fixed, stabilized, or maintained at artificially high levels; and

c. Individuals have been deprived of free and open competition.

128. Defendants' violations of the antitrust laws have caused Plaintiffs and members of the Class to pay higher prices for NPK Fertilizers than they would have in the absence of Defendants' conspiracies, and, as a result, Plaintiffs and members of the Class have suffered damages in the form of overcharges paid on their NPK Fertilizers purchases. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing agreements are per se unlawful, or, alternatively, are unlawful under either a quick look or rule of reason analysis.

129. Under the per se standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. However, Plaintiffs define such markets below in case their allegations are ultimately analyzed under a quick look or rule of reason analysis.

### Q. The Relevant Product Market Is NPK Fertilizers

130. To the extent a relevant product market needs to be defined in this action, it is the market for NPK Fertilizers. Additionally, or in the alternative, individual submarkets exist for Nitrogen Fertilizers, Phosphorus Fertilizers, and Potash.

### R. The Relevant Geographic Market Is National

131. Should a geographic market need to be defined in this action, it is the United States. Defendants produce and distribute NPK Fertilizers through locations across the United States and have increased NPK Fertilizer prices nationwide.

## STATUTE OF LIMITATIONS AND TOLLING

132. Plaintiffs and members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this action.

133. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and members of the Class.

134. Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint until early 2026, when U.S.D.A. made allegations that Defendants were engaging in anticompetitive conduct and DOJ's antitrust investigation was publicly revealed.

135. Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class has been tolled during the period of such fraudulent concealment.

## CLASS ALLEGATIONS

136. Plaintiffs repeat the allegations set forth above, as if fully set forth herein.

137. Plaintiffs bring this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Nationwide Direct Purchaser Class:

> All persons and entities in the United States who purchased NPK Fertilizers directly from one or more Defendants, or from any division, subsidiary, predecessor, agent, or affiliate of such Defendants, at any time during the period of January 1, 2021 ("Class Period") until Defendants' unlawful conduct and its anticompetitive effects cease to persist.

138. The following persons and entities are excluded from the above-described proposed Nationwide Direct Purchaser Class:

a. Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

b. All governmental entities;

c. All Counsel of Record; and

d. The Court, Court personnel, and any member of their immediate families.

139. ***Numerosity.*** The Class is so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members because such information is presently in the exclusive control of Defendants. Based on information and belief, there are likely, at a minimum, thousands of Class members in each Class.

140. ***Commonality.*** Common questions of law and fact exist as to all members of the Class. Each plaintiff in each Class was injured by the same unlawful scheme, Defendants' anticompetitive conduct was generally applicable to all members of each Class, and relief to each Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

a. Whether the Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize prices for Nitrogen Fertilizers;

b. Whether the Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize prices for Phosphorus Fertilizers;

c. Whether the Defendants and their Unnamed Co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize prices for Potash;

d. The duration of the conspiracies alleged herein and the acts performed by Defendants and their Unnamed Co-conspirators in furtherance of the conspiracies;

e. Whether such conspiracies violated the federal antitrust laws;

f. Whether the conduct of Defendants and their Unnamed Co-conspirators, as alleged in this Complaint, caused injury to Plaintiffs and other members of the Class;

g. Whether Defendants caused Plaintiffs and the Class to suffer damages in the form of overcharges on NPK Fertilizers;

h. The appropriate class-wide measure of damages; and

i. The nature of appropriate injunctive relief to restore competition in the markets for NPK Fertilizers.

141. ***Typicality and Adequacy.*** Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for NPK Fertilizers.

142. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

143. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

144. ***Predominance.*** The questions of law and fact common to the members of each Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

145. ***Superiority.*** Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of each Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

146. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## CLAIMS FOR RELIEF

## COUNT 1 - 15 U.S.C. § 1

### Price Fixing of Nitrogen Fertilizers in Violation of Section 1 of the Sherman Act

*By Plaintiffs and the Class*

147. Plaintiffs repeat the allegations set forth in paragraphs 1 through 146 above, as if fully set forth herein.

148. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2021 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants CF Industries, Nutrien, Koch, and Yara and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

149. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of Nitrogen Fertilizer causing anticompetitive effects without sufficient procompetitive justifications.

150. Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on Nitrogen Fertilizers.

151. Defendants' anticompetitive conduct had the following effects, among others:

a. Competition among Defendants has been restrained or eliminated with respect to Nitrogen Fertilizer prices;

b. The prices of Nitrogen Fertilizer have been fixed, stabilized, or maintained at artificially high levels; and

c. Plaintiffs and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

152. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

153. Plaintiffs and members of the Nationwide Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

**COUNT 2 - 15 U.S.C. § 1**

**Price Fixing of Phosphorus Fertilizers in Violation of Section 1 of the Sherman Act**
*By Plaintiffs and the Class*

154. Plaintiffs repeat the allegations set forth in paragraphs 1 through 153 above, as if fully set forth herein.

155. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2021 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants Nutrien, Mosaic and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

156. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of Phosphorus Fertilizers causing anticompetitive effects without sufficient procompetitive justifications.

157. Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in the form of overcharges on Phosphorus Fertilizers.

158. Defendants' anticompetitive conduct had the following effects, among others:

a. Competition among Defendants has been restrained or eliminated with respect to Phosphorus Fertilizer prices;

b. The prices of Phosphorus Fertilizers have been fixed, stabilized, or maintained at artificially high levels; and

c. Plaintiffs and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

159. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

160. Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 3 - 15 U.S.C. § 1

### Price Fixing of Potash Fertilizers in Violation of Section 1 of the Sherman Act

*By Plaintiffs and the Class*

161. Plaintiffs repeat the allegations set forth in paragraphs 1 through 160 above, as if fully set forth herein.

162. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2021 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants Nutrien, Mosaic, Canpotex and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

163. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of Potash causing anticompetitive effects without sufficient procompetitive justifications.

164. Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on Potash.

165. Defendants' anticompetitive conduct had the following effects, among others:

a. Competition among Defendants has been restrained or eliminated with respect to Potash prices;

b. The prices of Potash have been fixed, stabilized, or maintained at artificially high levels; and

c. Plaintiffs and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

166. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

167. Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 4 – UNJUST ENRICHMENT

*By Plaintiffs and the Class*

168. Plaintiffs repeat the allegations set forth in paragraphs 1 through 167 above, as if fully set forth herein.

169. Alternatively, from the acts of Defendants as alleged above, Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

170. Defendants have artificially increased the price of NPK Fertilizers paid by Plaintiffs and members of the Class.

171. Defendants reaped from Plaintiffs and members of the Class artificially high profits for NPK Fertilizers.

172. Defendants have been unjustly enriched by retaining the artificially high profits for NPK Fertilizers collected from Plaintiffs and members of the Class.

173. The retention of these profits by Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiffs and members of the Class.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully asks this Court for the following:

A. The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and its counsel of record as Lead Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including conspiracies, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a per se violation (or alternatively illegal under a quick look or rule of reason standard) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conspiracies alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D. The Court grant Plaintiffs and members of the Class all other equitable relief in the nature of disgorgement, restitution, and/or the creation of a constructive trust to remedy the Defendants' unjust enrichment;

E. The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

F. The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

174. Plaintiffs and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

Dated: May 4, 2026

Respectfully submitted,


*/s/ Patrick J. Stueve*
Patrick J. Stueve, MO Bar #37682
Steve N. Six, MO Bar #45241
Caleb Wagner, MO Bar #68458
Benjamin J. Stueve, MO Bar #71197
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
stueve@stuevesiegel.com
six@stuevesiegel.com
wagner@stuevesiegel.com
ben.stueve@stuevesiegel.com

Don M. Downing, MO Bar #30405
Jack A. Downing, MO Bar #70034
Dan R. Ritter, MO Bar #69298
**GRAY RITTER GRAHAM**
701 Market Street, Suite 800
St. Louis, MO 63101
Ph: 314.241.5620
ddowning@grgpc.com
jdowning@grgpc.com
dritter@grgpc.com

Rex A. Sharp, MO Bar #51205
Isaac L. Diel, MO Bar #39503
Hammons P. Hepner, MO Bar #77258
**SHARP LAW, LLP**
4820 W. 75thStreet
Prairie Village, KS 66208
(913) 901-0505
(913) 261-7564 Fax
rsharp@midwest-law.com
idiel@midwest-law.com
hhepner@midwest-law.com

Stuart A. Davidson (*pro hac vice* forthcoming)
Mark J. Dearman (*pro hac vice* forthcoming)
Anny Marie Martin (*pro hac vice* forthcoming)
**ROBBINS GELLER RUDMAN & DOWD LLP**
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: (561) 750-3000
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com
amartin@rgrdlaw.com

Alexandra S. Bernay (*pro hac vice* forthcoming)
Arthur L. Shingler III (*pro hac vice* forthcoming)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
xanb@rgrdlaw.com
ashingler@rgrdlaw.com